*In re* BARRY B., Alleged to be a Person in Need of Involuntary Psychotropic Medication (The People of the State of Illinois, Petitioner-Appellee, v. Barry B., Respondent-Appellant).

Second District No. 2—97—0691

Opinion filed April 13, 1998.

Teresa L. Berge, of Guardianship & Advocacy Commission, of Rockford, and William E. Coffin, John B. Lower, and Ellen Holden Clark, all of Guardianship & Advocacy Commission, of Chicago, for appellant.

David R. Akemann, State's Attorney, of St. Charles (Martin P. Moltz and Diane L. Campbell, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE THOMAS delivered the opinion of the court:

Respondent, Barry B., appeals the order of the circuit court of Kane County which granted the State's petition to involuntarily administer psychotropic medication to respondent. We affirm.

The facts relevant to our decision are briefly stated as follows. Respondent was a voluntary recipient of mental health care at the Elgin Mental Health Center (EMHC). Respondent refused to take psychotropic medication. Thus, on June 4, 1997, the State filed a petition pursuant to section 2—107.1 of the Mental Health and Developmental Disabilities Code (the Code) (405 ILCS 5/1—100 *et seq.* (West 1996)) to involuntarily administer psychotropic medication to respondent. A hearing on the petition occurred on June 13, 1997.

The State's first witness was Dr. Leach, a psychiatrist at EMHC. Dr. Leach testified that respondent was a voluntary patient at EMHC. He interviewed respondent on two occasions and diagnosed respondent with "bipolar disorder manic severe with psychotic features," a serious mental illness. Dr. Leach further testified that respondent was delusional. Respondent told Dr. Leach that he has multiple Ph.D.s, and respondent told other people that he is God and that other people are the devil and that God has to kill the devil. Respondent threatened to kill himself and a friend and to harm his mother and grandmother.

According to Dr. Leach, respondent realized he had a right to refuse medication and was exercising that right by refusing psychotropic medication. Respondent had taken psychotropic medication, including lithium and Tegretol, during past hospitalizations. Respondent told Dr. Leach that he did not like how he felt while on lithium. Dr. Leach did not know whether respondent understood the available options and their advantages and disadvantages. He tried to discuss with respondent the benefits of psychotropic medication and the advantages and disadvantages of various options, but respondent refused to listen. Respondent adamantly refused to take anything that was not natural and suggested that Dr. Leach prescribe peyote or marijuana for him. Dr. Leach did not know whether respondent was delusional about medication. He stated that respondent lacked

the capacity to make a reasoned decision about his medication, largely because respondent only saw risk associated with medication and no benefit.

Dr. Leach also testified that he wanted to prescribe Depacote as a mood stabilizer, Resperidone as an antipsychotic, and possibly Razepam as a sedative for respondent's mental illness. The mood stabilizer would address respondent's manic symptoms, the antipsychotic would address respondent's delusions, and the sedative would calm respondent until the mood stabilizer kicked in. Dr. Leach recommended that a liver test be performed on respondent and that the serum level of Depacote be checked.

Respondent's mother testified that respondent had been living with her the past four months. She noticed that his behavior had deteriorated over that time. He had mood swings and could not keep a job. He told her that he was God and that his friend was the devil and that he had to kill the devil. He was suicidal and threatened her. She further testified that her son had been in four hospitals during the previous year. He had taken Tegretol, but quit taking it because it made him feel intoxicated. She visited respondent at EMHC, and he told her that he would never take medication again and if somebody forced him to he would have to kill him.

Leigh Ololine, a friend of respondent, testified that he had noticed changes in respondent during the past year. When respondent was previously hospitalized, he was taking Tegretol. Respondent was calmer, more rational, and less delusional. He was able to deal with things like everyone else. He stopped taking the medication when he left the hospital, and his behavior deteriorated. Respondent alternated between depressed and manic states. Ololine testified that respondent threatened members of his own family in Ololine's presence and that respondent recently threatened him.

Respondent testified in his own defense that he was a voluntary patient at EMHC. He denied threatening to kill his friend, his mother, or grandmother. He admitted that he was suicidal in the past but not at the present. Respondent further testified that he had been on medication before, that he understood the benefits of medication but that it had no benefit for him. He explained that he believed in natural remedies.

According to respondent, he had taken several psychotropic medications before, including Clonopin, lithium, and Tegretol. One of these medications caused him to suffer vertigo, nausea, vomiting, and a feeling of intoxication. He did not like how he felt on the medication. Respondent acknowledged that Dr. Leach had discussed certain medications with him, but he had not changed his mind about their usage.

Following the testimonial evidence, the trial court enumerated the statutory elements necessary to support an order of involuntary psychotropic medication and found that the State had met its burden of proof on each point. The court then entered the preprinted order authorizing involuntary administration of psychotropic medication (including the necessary lab work and medical examinations) to respondent by such staff of the Illinois Department of Mental Health and Developmental Disabilities as have license to do so. Respondent filed a timely appeal.

On appeal, respondent contends that (1) the trial court erred in finding him to be a person in need of involuntary administration of psychotropic medication because the State failed to present clear and convincing evidence that he lacked the capacity to make a reasoned decision about the medication; and (2) the trial court's order granting the petition must be reversed because it fails to specify which psychotropic medications and which tests would be administered to respondent.

■ Section 2—107.1 of the Code permits a court to authorize the involuntary administration of psychotropic medication to a mental health care recipient if the following elements of proof are met by clear and convincing evidence:

"(A) That the recipient has a serious mental illness or developmental disability.

(B) That because of said mental illness or developmental disability, the recipient exhibits deterioration of his ability to function, suffering, or threatening or disruptive behavior.

(C) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in item (B) of this subdivision (4) or the repeated episodic occurrence of these symptoms.

(D) That the benefits of the psychotropic medication will outweigh the harm.

(E) That the recipient lacks the capacity to make a reasoned decision about the medication.

(F) That other less restrictive services have been explored and found inappropriate." 405 ILCS 5/2—107.1(a)(4) (West 1996).

See *In re Schaap*, 274 Ill. App. 3d 497, 501 (1995).

I

Respondent first contends that the trial court erred in finding him to be a person in need of involuntary administration of psychotropic medication because the State failed to present clear and convincing evidence that he lacked the capacity to make a reasoned decision about the medication. Respondent does not challenge the

State's evidence on the remaining five elements of section 2—107.1(a)(4) of the Code.

■ As stated previously by this court in cases involving the involuntary administration of psychotropic medication, as a reviewing court we give great deference to the trial court's factual findings because the court stands in the best position to weigh the credibility of all the witnesses; thus, we will disturb the trial court's decision only if it is manifestly erroneous. See *In re Israel*, 278 Ill. App. 3d 24, 35 (1996); *In re Kness*, 277 Ill. App. 3d 711, 718 (1996); *Schaap*, 274 Ill. App. 3d at 502. A trial court's decision is not manifestly erroneous unless the error is clearly evident, plain, and undisputable. *Kness*, 277 Ill. App. 3d at 718.

Respondent contends that the State failed to present clear and convincing evidence that he lacked the capacity to make a reasoned decision about the medication. The State, on the other hand, points to the expert testimony of Dr. Leach, who personally met with respondent and concluded that he did not have the capacity to make a reasoned decision about the medication.

■ In *Israel*, this court found that a court should consider the following factors in determining whether an individual has the capacity to make a reasoned decision concerning the administration of psychotropic medication:

"(1) The person's knowledge that he has a choice to make;

(2) The person's ability to understand the available options, their advantages and disadvantages;

(3) Whether the commitment is voluntary or involuntary;

(4) Whether the person has previously received the type of medication or treatment at issue;

(5) If the person has received similar treatment in the past, whether he can describe what happened as a result and how the effects were beneficial or harmful; and

(6) The absence of any interfering pathologic perceptions or beliefs or interfering emotional states which might prevent an understanding of legitimate risks and benefits." *Israel*, 278 Ill. App. 3d at 37.

None of these enumerated factors should be considered dispositive, and a court should consider any other relevant factors which it deems to be present. *Israel*, 278 Ill. App. 3d at 37.

■ We now consider respondent's argument in light of the above-mentioned factors. First, there was evidence presented that would indicate that respondent knew that he had a choice to make. Dr. Leach testified that respondent realized he had the right to refuse medication and was exercising that right.

Second, whether respondent was able to understand the available options and their advantages and disadvantages is a question not easily answered from the record. Dr. Leach testified that he did not know whether respondent understood the available options and their advantages and disadvantages. He further testified to having attempted to discuss the options available to respondent as well as their advantages and disadvantages. However, respondent refused to listen. Thus, through his own actions, respondent prevented this information from being discussed with him. While respondent may have been able to understand this information if he had been willing to listen to it, we cannot find in favor of respondent on this factor where respondent's own actions made it impossible to ascertain whether he could have understood the information.

Respondent correctly points out that the physician is obligated by statute to advise in writing the recipient of services that include the administration of psychotropic medication of the side effects of the medication. 405 ILCS 5/2—102 (West 1996). In this case, Dr. Leach did not advise respondent in writing of the side effects of the medication. Citing *In re Bontrager*, 286 Ill. App. 3d 226 (1997), respondent argues that Dr. Leach's failure to have informed respondent in writing of the side effects of the medication requires a reversal of the trial court's order granting the State's petition. We disagree. In *Bontrager*, the third district reversed the trial court order subjecting respondent to the involuntary administration of psychotropic medication. The third district did find that it was uncertain from the record whether the physician discussed or reviewed written explanations of the benefits and side effects with respondent as required by section 2—102 (*Bontrager*, 286 Ill. App. 3d at 231-32) and that this impacted upon the question of whether respondent was capable of making a reasoned decision concerning medication. However, the reversal stemmed not simply from the absence of evidence that the physician discussed or reviewed written explanations of the benefits and side effects of medication but from the third district's finding that the State had failed to prove by clear and convincing evidence the majority of the section 2—107.1(a)(4) factors.

Third, respondent was voluntarily at EMHC. This was confirmed through the testimony of Dr. Leach and respondent.

Fourth, while there was evidence that respondent had received three psychotropic medications in the past and that one of the medications had caused unwanted side effects for respondent, the record is void of evidence that respondent received the psychotropic medications recommended by Dr. Leach. Respondent testified to having received Clonopin, lithium, and Tegretol in the past. However, Dr.

Leach testified that he was recommending the administration of De-pacote, Resperidone, and Razepam.

Fifth, the record does not indicate that respondent had previously taken the psychotropic medications recommended by Dr. Leach. Therefore, the record cannot shed guidance on how such medications would affect respondent once administered. Dr. Leach testified that there would be significant benefits and minimal side effects from the medications he wished to prescribe for respondent. Moreover, even though respondent testified that other psychotropic medication had caused unwanted side effects and that such medication had no bene-fit for him, both respondent's mother and friend testified that the medication had normalized respondent's behavior.

Sixth, the record contained evidence of interfering pathologic perceptions or beliefs or emotional states that undoubtedly prevented respondent from understanding the legitimate risks and benefits. It was not unreasonable to conclude that respondent's pathologic perceptions prevented him from being able to understand the risks and benefits of medication. Respondent testified that he saw the ben-efit of medications, but not for himself. Respondent's failure to perceive *any* benefit whatsoever from the medications flew in the face of Dr. Leach's expert testimony concerning the benefits of such medi-cations and of the testimony of both respondent's mother and friend that such medications helped to stabilize his behavior. Likewise, it was not unreasonable to conclude that respondent's emotional state also prevented him from being able to understand the risks and benefits of medication. Dr. Leach, Ololine, and respondent's mother each testified concerning the delusions suffered by respondent. Al-though Dr. Leach admitted that he did not know whether respondent was delusional about the medication itself, he stated that respondent clearly had troubles distinguishing reality from fiction.

After considering each of the above factors and the testimonial evidence concerning threats of harm made by respondent to himself and to others, we do not find that the trial court's decision that re-spondent lacked the capacity to make a reasoned decision concerning the medications at issue was manifestly erroneous.

## II

Respondent next contends that the trial court's order granting the petition must be reversed because it fails to specify which psycho-tropic medications and which tests would be administered to respon-dent. We disagree.

The statute authorizing the involuntary administration of psy-chotropic medication requires that the *petition* set forth the specific

testing and procedures sought to be administered. 405 ILCS 5/2—107.1(a)(1) (West 1996). Here, the State's petition for the involuntary administration of psychotropic medication specified the psychotropic medication sought to be administered to respondent as well as the tests that would likely be necessary.

While the statute authorizing the involuntary administration of psychotropic medication does require that the order granting a petition designate the persons authorized to administer the medication (405 ILCS 5/2—107.1(a)(6) (West 1996)), the statute does *not* require that the *order* designate the medications or tests to be administered. Respondent fails to cite a single case to the contrary.

We find that the order entered in this case was legally sufficient even though it did not specify the precise medications or tests to be administered. At the hearing on the instant petition, the trial court stated that it was granting the petition based upon the testimony at the hearing, which revealed the precise medications and tests to be administered. Moreover, the order entered in this case appears to be worded similarly to the order that this court found to have been properly entered in *Schaap*, 274 Ill. App. 3d at 500 (where the trial court entered a preprinted order authorizing involuntary administration of psychotropic medication (including the necessary lab work and medical examinations) to respondent by such staff of the Illinois Department of Mental Health and Developmental Disabilities as have licenses to do so). Nevertheless, because of the substantial liberty interests involved in the involuntary administration of psychotropic medication, we believe that the better practice by the trial court would be to include the precise medications and tests to be administered in its order granting a petition for involuntary medication. This will ensure that the provider of medical care has strict guidance for the treatment of a patient who is to receive psychotropic medication involuntarily.

For the foregoing reasons, we affirm the order of the circuit court of Kane County granting the State's petition for the involuntary administration of psychotropic medication.

Affirmed.

GEIGER, P.J., and BOWMAN, J., concur.